[Civ. No. 31177.    Second Dist., Div. One.    Mar. 20, 1967.]

UNA McCAFFERTY, Plaintiff and Appellant, v. O. T. GILBANK, Defendant and Respondent.

Richard A. Perkins for Plaintiff and Appellant.

Schell & Delamer and Eugene D. Hillman for Defendant and Respondent.

LILLIE, J.—Plaintiff appeals from a judgment of nonsuit in an action seeking compensatory and punitive damages from defendant, an attorney at law, for conversion. The property allegedly converted consisted of her claimed interest in the proceeds of two drafts payable jointly to defendant and Robert Swiger, his client and plaintiff's former husband, in settlement of the latter's action, then pending in Los Angeles, against one Jean and arising from an automobile accident. Prior to the above settlement, finalized in December of 1963, plaintiff had secured a judgment in Ohio against Swiger in the amount of $10,320. In October of that year, plaintiff and Swiger entered into a witten agreement wherein Swiger agreed to pay, in full satisfaction of the Ohio judgment, a sum equal to one-half of the net proceeds of the Los Angeles action either by settlement or judgment. Defendant participated in the negotiation of the above agreement with plaintiff's Ohio lawyers; thereafter he personally participated in the encashment of the two drafts. The motion for an order of nonsuit was upon the grounds that as a matter of law plaintiff had no property interest in the money which Swiger recovered and defendant, furthermore, had no control over any funds to which plaintiff was legally entitled.

■ While in most appeals it is the duty of a reviewing court to indulge every reasonable intendment in favor of sustaining the trial court, substantially the reverse is true when the appeal is from a judgment of nonsuit. ■ Thus, ''The granting of a motion for nonsuit is warranted '. . . when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.' [Citations.]'' (*Raber* v. *Tumin,* 36 Cal.2d 654, 656 [226 P.2d 574].) ■ Since the present proceeding turns in considerable part upon the construction to be given the written agreement of October 1963, under the rule above quoted we are not bound by the trial court's interpretation thereof and it must be construed most favorably to plaintiff. (*Sunset Milling & Grain Co.* v. *Anderson,* 39 Cal.2d 773,

780 [249 P.2d 24].) ▮▮▮ The case was tried with full recognition of the settled law that one who has neither title nor possession, nor any right to possession cannot recover in an action for conversion. (*Yukon River etc. Co.* v. *Gratto,* 136 Cal. 538, 542 [69 P. 252].) Plaintiff, however, relied on a refinement of the controlling law to the effect that ''One who holds property by virtue of a lien upon it may maintain an action for conversion if the property was *wrongfully* disposed of by the owner and without authority . . .'' (*Bastanchury* v. *Times-Mirror Co.*, 68 Cal.App.2d 217, 236 [156 P.2d 488]); according to plaintiff, the language of the instrument was properly construable as an assignment of an equitable lien and, therefore, a property interest in the proceeds of any recovery. Defendant does not deny that an equitable lien, if such was created by the instrument, could establish a property right in the fund.

Under all the circumstances here presented we are of the opinion that the trial court's determination to the contrary, implicit in its order granting a nonsuit, was erroneous. We are of the further view that other theories presented by defendant in support of the order are not sustainable. It was, therefore, error to grant the motion, and the judgment must be reversed.

The following background facts are without dispute: In May of 1963 plaintiff's Ohio lawyers gave notice of a motion to obtain judgment in an action for child support. Swiger received the notice in California and took it to defendant. There presumably being no defense to the motion, judgment was rendered as prayed on June 10, 1963. Swiger's action against Jean was then pending; the claims therein consisted of damages for his own personal injuries, damages for the wrongful death of his wife (who was killed in the accident) and, as guardian ad litem of her children by a former marriage, damages for their mother's death. On June 10, 1963, defendant telephoned the Ohio lawyers and made a proposal of settlement; at that time he knew that under California procedure plaintiff could impose a judicial lien on any California judgment secured in the Swiger-Jean action. (Code Civ. Proc., § 688.1.) This was followed by a letter, dated June 19, enclosing a list of special damages claimed against Jean and stating Swiger's willingness, in exchange for a complete release, to give plaintiff one-half of any moneys received from the Jean action, after the payment of attorney's fees, court costs and the special damages therein set forth; the letter further stated that ''If this is satisfactory, we can execute any necessary

papers to guarantee that she will receive her money under the agreement.'' Certain counterproposals were made by plaintiff's counsel, to which letter defendant replied on July 1; among other things, it was suggested by defendant that future child support payments be reduced. On July 15 one of the Ohio lawyers replied to that letter, stating in part that ''All of the provisions are in accordance with my previous correspondence and with the exception of the taking up of the reduction in support at this time feel that we can draw an agreement covering the points. If you will submit a draft of this agreement to me I will expedite it.'' On August 1 defendant forwarded a draft of the agreement, declaring that Swiger was willing to settle the matter of arrearage (since the Judgment) at some future time. On August 23 one of the Ohio lawyers returned defendant's draft which he found ''in order'' and added: ''The only further condition which I would attach which I feel implied in the agreement is that the assignment cover any settlements reached in the personal injury claim . . . and any settlement received in a representative capacity. . . .''

On October 2 defendant sent the Ohio lawyers a revised form of agreement in ''conformance'' with their letter, specifying that the fund to be divided include damages for Swiger's injuries and for the death of his wife, but excluding any sum obtained by Mrs. Swiger's children. The preamble of the agreement recited that plaintiff had recovered a judgment against Swiger, made mention of the pending Jean action, and stated that ''it is proposed to settle the said judgment from a part of the proceeds of the personal injury action.'' Swiger then agreed ''to pay in full satisfaction of the judgment obtained against him'' by plaintiff ''one-half (½) of the net proceeds of said action''; further, ''that upon the completion or settlement thereof, Robert Raymond Swiger shall make a full accounting in conformance herewith to Una Kyle (as she was then known), ''and upon the receipt of the said funds allocated herein to Una Kyle by the attorney for Una Kyle, the latter ''shall have executed a full satisfaction of judgment'' in the Ohio action. The above agreement was signed by the parties and constitutes the instrument we must construe.

In December of 1963 all of the claims in the Swiger-Jean action were settled for $12,300. Because a portion thereof involved minor children, court approval became necessary. On December 23 the court ordered payment of $1,000 to the guardian of the minor plaintiffs, the balance being apportioned to

Swiger and defendant as his attorney. Two drafts payable jointly to Swiger and defendant were immediately handed to defendant by Jean's counsel: one for $3,300, and the other for $9,000. Immediately defendant and his client went to the bank on which the drafts were drawn. After proper endorsements, the same were presented to the bank with orders for payment of the proceeds as follows: $4,199.70 to defendant (by cashier's check); $6,060 to Swiger (by cashier's check); $200 to Swiger (cash); $1,000 to the guardian of the minors (by cashier's check); $852.55 to a Covina hospital (by cashier's check); and $1.75 for bank charges.

Defendant then returned to his office, and Swiger went his way; to defendant's knowledge, he has not been seen or heard from since. Plaintiff received no part of the above funds. Defendant did nothing to inform plaintiff's lawyers of the settlement. A letter from them asking for information on the matter was not answered by defendant because, as he testified, they threatened him. Finally, on March 4 they reached him by telephone and the data requested was furnished. The present action was commenced in December of 1964.

Certain overtones bearing on the ethics of the profession crept into the trial, but the court properly observed that the proceeding was not a hearing before a disciplinary committee of the State Bar concerning a breach of any of the canons.[1] Rather, as hereinabove stated, the question is whether the agreement conferred upon plaintiff an equitable lien on one-half of the settlement proceeds (amounting to $1,826.80) under the formula contracted for,[2] and, if so, whether defendant converted her interest therein, thus acquired.

Preliminarily, as agreed by both sides, plaintiff could not have received an assignment of Swiger's cause of action for personal injuries (*Fifield Manor* v. *Finston*, 54 Cal.2d 632 [7 Cal.Rptr. 377, 354 P.2d 1073, 78 A.L.R.2d 813]); the point of difference is in the proposition, advanced by defendant, that Swiger's "promise to pay an obligation out of the proceeds of a specific fund is not a present assignment of any portion of the fund." Cited by defendant is *Estate of Henshaw*, 68 Cal.

---

[1]At this stage of the appeal there is no discussion of the right to exemplary damages flowing from a tort committed by mistake but with such recklessness as evinces malice or a conscious disregard of the rights of others. (See *Roth* v. *Shell Oil Co.*, 185 Cal.App.2d 676, 682 [8 Cal. Rptr. 514].)

[2]Applied to the present proceeding, the law is clear that "An agreement may be made to create a lien on property not yet acquired by the party agreeing to give the lien, or not yet in existence." (31 Cal.Jur.2d, Liens, § 13, p. 245.)

App.2d 627 [157 P.2d 390], where the declaration, above quoted, appears (p. 635); however, it is preceded by the word "Ordinarily" and the existence of respectable contrary authority is noted. Thereafter the court observed that in an effort to see that equity is done, the court may relax such rule and permit evidence to show the intention of the parties beyond the limited words of the contract. The court further declared: "The accepted rule is that equitable liens are favored to do justice and prevent unfair results. [Citations.] When therefore after a full and impartial hearing the trial court finds upon the only reliable evidence presented that the parties intended to create an equitable assignment and an equitable lien such finding should not be disturbed." (P. 636.)

Since equity, if possible, should be done in proceedings of this character, it is well established that equity looks to substance rather than to form. "The form of a written, equitable transfer or assignment, based upon valuable and reasonable consideration, is not important if the intention of the transferor is ascertainable and the instrument is actually delivered." (*Anglo California Nat. Bank* v. *Kidd,* 58 Cal. App.2d 651, 655-656 [137 P.2d 460].) Too, in determining whether an assignment has been made, the court may go outside the terms of the instrument and find an assignment from the conduct of the parties. (*Long* v. *Thompson,* 45 Cal. App.2d 161, 169 [113 P.2d 698].) The terms of the present instrument are not difficult to ascertain; thus, the fund is clearly defined, being the proceeds of the recovery in the Swiger-Jean litigation, and the amount of its division is expressly set forth, namely, "one-half (½) of the net proceeds of said action" after certain deductions therein specified. Compared to assignments in other reported cases, it more than meets the test of ascertainability; for example, in *Bartlett* v. *Pacific Nat. Bank,* 110 Cal.App.2d 683 [244 P.2d 91], the promise was to pay an attorney "one-fourth of all money recovered"; in *Estate of Henshaw, supra,* the fund assigned was "from the proceeds of said trust estate"; and in *Long* v. *Thompson, supra,* there was a promise to pay the creditor when the judgment debtors recovered their claim against the United States.

With respect to the conduct of the parties, viewed favorably to plaintiff, the settlement transaction was initiated by defendant and the instrument was drawn by him. The inference is deducible that such steps were taken with the knowledge that defendant was thus protecting himself from a judicial lien

imposable in the Swiger-Jean action. The letter of August 23 from the Ohio lawyers referred to the transaction as an "assignment" which description he did not dispute when he sent them a revised form of agreement "in conformance" with that letter. Finally, it should be noted that defendant proposed "dividing" the net proceeds of the recovery in California; reasonably interpreted, this points to the draftsman's intention that plaintiff be given a property interest in such proceeds and not just his client's promise to pay the agreed sum when due.

The second, and last, point is whether defendant by endorsing the two drafts became liable for conversion. ▮ In *Pilch* v. *Milikin*, 200 Cal.App.2d 212 [19 Cal.Rptr. 334], this court said that any act of dominion wrongfully exerted over the personal property of another inconsistent with the owner's rights thereto constitutes conversion. (P. 224.) The negotiation of the drafts was certainly an act of dominion contemplated in *Pilch*. ▮ "Where the conversion is the result of the acts of several persons, which, though separately committed, all tend to the same end, there is a joint conversion." (*Mier* v. *Southern Cal. Ice Co.*, 56 Cal.App. 512, 518 [206 P. 83].) In an early case it was declared: ▮ " 'It is no defense to an action of trover that the defendant acted as the agent of another. If the principal is a wrong-doer, the agent is a wrong-doer also.' " (*Swim* v. *Wilson*, 90 Cal. 126, 128 [27 P. 33, 25 Am.St.Rep. 110, 13 L.R.A. 605].) ▮ The facts above summarized clearly bring the instant case within the rules above set forth. Defendant argued below that he had an obligation to turn the fund over to his client in spite of the agreement which he himself had drafted; this is a curious contention which cannot be sustained. To the contrary, the procedure that should have governed defendant is discussed in *Miller* v. *Rau*, 216 Cal.App.2d 68 [30 Cal.Rptr. 612]. Appellant Rau was an attorney who received funds claimed by respondent; he later turned the funds over to a partnership. As here, it was argued that he had a duty to do so. Said the court: "Although appellant argues that he had a duty to pay the funds to the partnership, the correct principle in the factual context of the instant case is expressed in *General Exchange Ins. Corp.* v. *Driscoll, supra,* where the court states [315 Mass. 360 (52 N.E.2d at p. 973)] : 'There was nothing in the defendant's status as attorney for [his client] . . . which made it his duty to pay to his client money *which he knew* . . . belonged to plaintiff. [Citations.] The defendant had

complete control over the money. It was his duty to hold for the plaintiff so much of the proceeds . . . as represented the plaintiff's known interest in it.' Not only would the *General Exchange Ins. Corp.* rule belie Rau's claim of duty to remit to Aivex, it would impose on him a *positive duty* to hold 25 per cent of the net profits for Miller. The reasoning behind such a rule being sound and consistent with fairness, it should be applied in this case. (Accord: *Tillman* v. *Bungenstock,* 185 Mo.App. 66 [171 S.W. 938, 939] : 'But where a third party has paramount title to the money in the hands of the agent, and notifies the latter of his claim, if the agent nevertheless pays the principal, he is liable to the true owner'; *Sims* v. *Brown,* 6 Thomp. & C. (N.Y.) 5, affirmed 64 N.Y. 660; see also, Note 2 L.R.A. N.S. 657.) *Dunn* v. *Vannerson,* 5 Miss. (7 How.) 579, cited by appellant as the only case involving an attorney as the agent, does not reach the question here presented.'' (Pp. 76-77.)

The judgment is reversed.

Wood, P. J., and Fourt, J., concurred.